United States District Court
Connecticut
FILED AT NEW HAVEN

February 16          20 23

By      S. Santos
                Deputy Clerk

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | **Filed Under Seal** |
| | : | |
| | : | ss: New Haven, Connecticut |
| | : | |
| COUNTY OF NEW HAVEN | : | February 16, 2023 |

## AFFIDAVIT IN SUPPORT OF APPLICATIONS
## FOR SEARCH AND SEIZURE WARRANTS

I, James Formica, being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent with the Food and Drug Administration ("FDA") Office of Criminal Investigations ("FDA-OCI") of the Department of Health and Human Services and have been so employed since October 2014.  My function as a Special Agent is to investigate violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, along with other relevant crimes.  Prior to my employment at FDA-OCI, I was a Special Agent with Internal Revenue Service Criminal Investigation for over 12 years.  I have executed numerous search warrants for personal and business records relevant to ongoing criminal investigations.

2.      I am currently investigating one or more individuals who are engaged in a scheme to sell, distribute, and dispense misbranded and unapproved prescription drugs over the Internet through a website, www.pinnedaminos.com (the "TARGET WEBSITE"), and to deliver those misbranded and unapproved prescription drugs to customers, including customers in the United States, without the issuance of valid prescriptions, in violation of 21 U.S.C. §§ 331(a), 331(d), and 333(a) (introduction of misbranded or unapproved drugs into interstate commerce), 18 U.S.C. § 545 (smuggling goods into the United States), 18 U.S.C. § 1956 (money laundering), 18

1

U.S.C. § 371 (conspiracy), and 18 U.S.C. § (aiding and abetting) (collectively, the "TARGET OFFENSES").

3.    I submit this affidavit in support of Applications for Search Warrants for information associated with the following email and social media accounts:

a.    the email account pinnedaminos@gmail.com (the "TARGET EMAIL ACCOUNT"), which is more fully described in Attachment A-1, that is stored at premises controlled by Google LLC ("Google"), an e-mail provider located at 1600 Amphitheatre Parkway in Mountain View, California 94043; and

b.    the Facebook account for Pinned Aminos (account # 195505841961751) (the "TARGET FACEBOOK ACCOUNT") and the Instagram account for pinned_aminos (the "TARGET INSTAGRAM ACCOUNT"), which are more fully described in Attachment A-2, that is stored at premises controlled by Meta Platforms Inc. ("Meta"), a social media provider located at 1601 Willow Road, Menlo Park, CA 94025.

4.    I submit this affidavit under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google and Meta to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachments A-1 and A-2, and upon receipt of that information, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1 and B-2.

5.    Based on the information set forth in this affidavit, I believe there is probable cause to believe that the TARGET EMAIL ACCOUNT, the TARGET FACEBOOK ACCOUNT, and THE TARGET INSTAGRAM ACCOUNT constitute and

2

contain items that constitute instrumentalities, fruits, and evidence of the TARGET OFFENSES, as further described in Section II of Attachments B-1 and B-2.

6.      The statements contained in this affidavit are based in part on information provided by other members of local, state, and federal law enforcement, my own investigation to include personal observations, documents, and other investigative materials which I have reviewed, as well my training and experience as a Special Agent. Since this affidavit is being submitted for the limited purpose of securing search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrants.

## JURISDICTION

7.      This Court has jurisdiction to issue the requested warrants for the TARGET EMAIL ACCOUNT pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) and (c)(1)(A) because this Court is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that– has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## APPLICABLE STATUTES

8.      Under the FDCA, the term "drug" includes articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man and other non-food articles intended to affect the structure or any function of the body.  21 U.S.C. § 321(g)(1).

9.      Under the FDCA, a prescription drug is defined as a drug intended for use by man which (a) because of its toxicity or other potentiality for harmful effect, or the

method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a licensed medical practitioner, or (b) FDA requires as a condition of the drug's approval that the drug be used only under the supervision of a licensed medical practitioner.  21 U.S.C. § 353(b)(1).

10.     A prescription drug is deemed to be "misbranded" if it is dispensed without the valid prescription of a licensed medical practitioner.  21 U.S.C. § 353(b)(1).

11.     Under the FDCA, a drug is also "misbranded" if its labeling is false or misleading.  21 U.S.C. § 352(a).

12.     Under the FDCA, it is illegal to introduce, or cause the introduction of, a misbranded drug into interstate commerce.  21 U.S.C. § 331(a).

13.     Under the FDCA, it is also illegal to introduce, or cause the introduction of, a new drug that lacks FDA approval into interstate commerce.  21 U.S.C. § 331(d).

14.     Failure to comply with the above noted laws is subject to criminal penalties under 21 U.S.C. §333(a), and criminal liability also can attach under 18 U.S.C. § 2 (aiding and abetting) and 18 U.S.C. § 371 (conspiracy).

15.     Under 18 U.S.C. § 545, it is unlawful to knowingly import into the United States any merchandise contrary to law.

16.     Under 18 U.S.C. § 1956, it is unlawful to conduct a financial transaction involving proceeds of specified unlawful activity in order to, among other things, promote the carrying on of specified unlawful activity or conceal or disguise the nature, location, source, ownership or control of such proceeds.  The term "conducts" is defined to include initiating, conducting, or participating in initiating, or concluding a transaction. The term "specified unlawful activity" includes violations of 18 U.S.C. § 545.

4

## BACKGROUND ON EMAIL ACCOUNTS

17.     In my training and experience, I have learned that Google offers a variety of on-line services, including electronic mail ("e-mail" or "email") access known as gmail, to the public.  Subscribers obtain a gmail account by registering with Google.  During the registration process, Google typically requires subscribers to provide basic personal information.  Therefore, Google's computers are likely to contain stored electronic communications (including retrieved and unretrieved email for subscribers) and information concerning subscribers and their use of Google's services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

18.     In general, an email that is sent to a subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on Google's servers indefinitely.

19.     When the subscriber sends an email, Google often saves a copy of the email that is sent.  Unless the sender of the email specifically deletes the email from Google's server, the email can remain on the system indefinitely.

20.     A sent or received email typically includes the content of the messages, source and destination addresses, the date and time at which the email was sent or received, and the size and length of the email.  If an email user writes a draft message but does not send it, that message may also be saved.

21.     In my training and experience, Google generally asks its subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

22.     In my training and experience, Google typically retains certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the IP address[1] used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

---

[1] "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet.

23.     In my training and experience, in some cases, email account users will communicate directly with Google about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Google typically retains records about such communications, including records of contacts between the user and the Google support services, as well records of any actions taken by Google or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

24.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contact lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described above, email providers typically log the IP addresses from which users access the email account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access

7

and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).  Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

25.     Based on my training and experience, I also know that email providers do not have the resources or the expertise to identify specific mail messages or other records relevant to a criminal investigation.  Instead, it is the practice of email providers to copy all email messages and other records from a specified account in response to a search warrant.  Accordingly, the warrants require Google to disclose to the government copies of all the information described in Section I of Attachment A-1, and upon receipt of the information, government-authorized persons will review that information to locate the items described in Section II of Attachment A-2.

## BACKGROUND ON FACEBOOK

26.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

27.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

28.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

29.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

9

30.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

31.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video, and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

32.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats and the date of each call.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

33.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

34.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

35.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

36.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

37.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

38.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about the user's access or use of that application may appear on the user's profile page.

39.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP addresses used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP addresses is retained by Meta along with a timestamp.

11

40.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

41.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).   In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.   Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

42.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may

be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used.   For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.   By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.   Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.   Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner.   Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.   For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

43.    Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## BACKGROUND ON INSTAGRAM

44.    Instagram is a service owned by Meta.   Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile

13

application, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

45.    Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

46.    Meta also collects and retains information about how each user accesses and uses Instagram.  This includes information about the IP addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

47.    Each Instagram account is identified by a unique username chosen by the user.  Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

48.    Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account or transfer an image from

Instagram to a connected image printing service.  Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

49.    Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

50.    Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users.  Users can also manually search for friends or associates.

51.    Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

15

52.     One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.  Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

53.     Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").  An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

54.     An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

55.     Instagram allows users to broadcast live video from their profiles.  Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

56.     Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join.  Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings.  Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

57.     Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

58.     Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

59.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

17

60.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

61.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

62.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

63.     In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

18

64.    For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

65.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

66.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

67.     Other information connected to the use of Instagram may lead to the discovery of additional evidence.  For example, Instagram may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

68.     Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## THE INVESTIGATION AND PROBABLE CAUSE

69.     On August 31, 2022, United States Customs and Border Protection ("CBP') Officer Noel Oliveras informed me along with others that CBP had intercepted a shipment from India destined for Pinned Aminos LLC (the "TARGET COMPANY") at a residential address, known to me, in Glastonbury, CT (the "Glastonbury Address"). The shipment contained 300 boxes with 10 foil packs per box containing 30,000 total tablets of what was labeled Ivermectin 12mg tablets. The labeling indicated that the Ivermectin was manufactured by a company, whose identity is known to me, in India. Ivermectin is an unapproved drug in the United States. A picture of one of the boxes and foil packs is shown below:



70.     Based on my training and experience, I know that individuals and companies must pay money to import drugs from overseas, such as the parcels of Ivermectin described above.

71.     According to the Connecticut Secretary of State's online database, the TARGET COMPANY is incorporated at the Glastonbury Address.  Their NAICS code is "Drugs and Druggist Sundries Merchant Wholesales."  Ryan Fields ("R.F.") is listed as the principal with the same address.

72.     I have reviewed the TARGET WEBSITE and observed a variety of drugs, including unapproved and prescription drugs, being sold. The website also sells disposable hypodermic needles.

73.     The website's Terms & Conditions state, among other things:

> The chemicals/materials for sale here are intended for laboratory and research use only, unless otherwise explicitly stated. They are not intended for human ingestion or for use in products that may be ingested. You must be at least 18 (eighteen) years of age to purchase goods on this website.

The website also contains an FDA Disclaimer that states:

> The statements made regarding these products have not been evaluated by the Food and Drug Administration.  The efficacy of these products has not been confirmed by FDA approved research.  These products are not intended to diagnose, treat, cure or prevent any disease.  All information presented here is not meant as a substitute for or alternative to information from healthcare practitioners.  Please consult your healthcare professional about potential interactions or other possible complications before using any product.  The Federal Food Drug and Cosmetic Act requires this notice.  [The TARGET COMPANY] is not responsible for damages or injury due to misuse of product.

74.     Based on my training and experience, I know that some sellers of illegal unapproved drugs will make statements on websites and on products to state the drugs are for research purposes only, when in fact the drugs are intended for human drug use to affect the structure or function of the human body or to cure, mitigate, treat, prevent, or diagnose a disease.

75.     The only contact information displayed on TARGET WEBSITE is the email TARGET EMAIL ADDRESS, which is in the website's footer.

76.     On October 31, 2022, I received a forwarded email from Special Agent Mark Fields of FDA-OCI informing me that CBP seized 2 parcels destined for R.F. at the Glastonbury Address. The parcels contained 200 vials of mannitol.  A sample of the

seized parcel was sent to a laboratory for analysis. CBP laboratory analysis states the drug is "mismanifested" and recommends the drug be sent to another laboratory for comprehensive analysis. Mannitol is a drug that requires a prescription.

77.     On December 5, 2022, an FDA-OCI agent made an undercover purchase using an undercover credit card from the TARGET WEBSITE. The agent placed on order for Prostaglandin E1 2mg, Albuterol 6mg/ml 30 ml, and Thymosin Alpha 1 2mg. The cost was $99.00. The agent requested the order be shipped to an undercover mailbox in Rhode Island.  The website did not require a prescription from a licensed medical practitioner.

78.     On or about December 16, 2022, a package from R.F., listing a P.O. Box in Glastonbury, CT, was delivered to the undercover mailbox in Rhode Island.  The package contained a bottle labeled 6mg/ml Albuterol Sulfate Research Compound, a vial from labeled Prostaglandin E1 2mg Research Compound, and a vial labeled Thymosin Alpha 1 2mg Research Compound.

79.     Albuterol Sulfate is used to prevent and treat wheezing and shortness of breath and is often used with an inhaler, for which a prescription is necessary. While reviewing body building websites I've seen numerous references to liquid Albuterol Sulfate being used as a performance enhancing drug. Prostaglandin E1 can be used to treat erectile dysfunction and requires a prescription to acquire it legally.  The Albuterol Sulfate and Thymosin Alpha 1 purchased from the TARGET WEBSITE and delivered to the undercover mailbox were in liquid form in a vial, which is not approved by the FDA.

80.     On December 16, 2022, an undercover FDA-OCI agent sent an email to the TARGET EMAIL ACCOUNT from an undercover email account.  The email stated: "Hey, what's going on? The vial of prostaglandin was empty!! See the picture below and the albuterol tastes like there is nothing in it - why does it taste diluted - I want the prostaglandin - can you send me one that is not empty."  On December 16, 2022, an email from the TARGET EMAIL ACCOUNT responded with an enhanced picture of the prostaglandin stating "looks like a lot to me."  Another email from the TARGET EMAIL ACCOUNT on the same date states "The prostaglandin is not empty.  It looks like that because it has no additional fillers / mannitol.  Add your bac water and it will be fine. The dosing for the Albuterol is as stated on the vial.  We have never had complaints about it being diluted and tasting like nothing."

81.     On December 27, 2022, an undercover FDA-OCI agent sent an email to the TARGET EMAIL ACCOUNT stating: "Thanks for the order-I feel like I can feel the results already - One question-I'm over 50 and I'm tired all day which makes getting to my workout tough - Do you guys have anything to help with fatigue?" On the same day an email from the TARGET EMAIL ACCOUNT responded: "Depends on what you're willing to do. The easiest would be nasal Semax or Nasal Nad+. You can also reconstitute those and do them SubQ injections, if you order the Nad powder. NADH is also subQ. Or there is Motivator and Carnitine, both intramuscular."

82.     Based on these emails, I believe that despite the TARGET WEBSITE's statement that the drugs for sale are for laboratory and research purposes only, the website operators are aware that the drugs are being purchased for human consumption.

83.     A service used by FDA-OCI called LegitScipt[2] identified the TARGET FACEBOOK ACCOUNT, a private Facebook group that was created on March 19, 2021. The information under "About this group" reads, Intramuscular amino injectables." There are over 2,000 members to this group.  R.F. and two other individuals are listed as the administrators of the group. The Facebook group promotes the TARGET WEBSITE. R.F. also promotes the TARGET COMPANY on his personal Facebook profile.

84.     An April 2021 post on R.F.'s Facebook profile showing the TARGET COMPANY's products has the following comment thread in which R.F. discusses the use of the products in people. R.F. is asked "Are any of these SARM's" (Selective Androgen Receptor Modulators). R.F.'s first comment states "nope, all Aminos. SARMS are suppressive, better off on gear if you're gonna go that route."  R.F. follows that comment with "pretty much the stuff you would get from an overpriced California or Florida Spa.  Like Titan Medical Center but my stuff is dosed higher in some areas like Carnitine because it doesn't work until a certain saturation or my B12 I dose at 400mcg when a spa would put it at 1000 to get you high for the day but nothing you could take daily without side effects." Another of R.F.'s comment states "stuff works best in conjunction with TRT [testosterone replacement therapy] except in women it seems to do better than any form of gear."

---

[2] LegitScript is an internet pharmacy verification service that compiles information regarding regulated healthcare products offered over the Internet.  The company, which was founded in 2007 by a former employee of the Office of National Drug Control Policy, has been retained by various businesses and government agencies.  In addition, LegitScript is endorsed by the National Association of Boards of Pharmacy.  The FDA has a contract with LegitScript for its services.  In my experience, information provided by LegitScript has proven reliable.

85.     SARMS are drugs that have not been approved by the FDA. Nonetheless, based on my training and experience, I believe the R.F.'s Facebook comments described in the previous paragraph indicate he is promoting the sale of SARMS sold on the TARGET WEBSITE for human consumption.

86.      An Instagram profile with the username "pinned_aminos" has the same profile photo as R.F.'s personal Facebook profile photo and R.F.'s name in its bio. The "pinned_aminos" Instagram account has pictures of numerous TARGET COMPANY products. LegitScript also noted that R.F. has promoted TARGET COMPANY products for human drug use on Instagram.  Some of the Instagram posts are images that also appear on the TARGET WEBSITE that describe the benefits of the ingredients, such as reducing stress and anxiety and improving muscle recovery. Additionally, an image displayed on Instagram and the clenbuterol page of the TARGET WEBSITE features a man lifting a dumbbell and has the phrase "Get Ripped" superimposed on it, which I believe is suggesting that customers purchase clenbuterol from the TARGET WEBSITE for human consumption.

87.     The FDA has not approved clenbuterol for use in humans.

88.     According to LegitScript, the TARGET WEBSITE domain name was created in September 2021 and R.F. was the registrant in October 2021.  On February 14, 2021.

89.     On February 14, 2023, Agents with the State of Connecticut Department of Consumer Protection communicated with R.F. by phone and email (using the TARGET EMAIL ACCOUNT) regarding the TARGET COMPANY and indicated the company was not in compliance with Connecticut state law.  On February 15, 2023, I

checked the TARGET WEBSITE and it is no longer operational. The website states: "We'll be back. This website is on vacation. The website will be alive again in the upcoming weeks. Contact us if you have any questions at [the TARGET EMAIL ACCOUNT."

90.     Based on the foregoing, I believe there is probable cause to believe the TARGET EMAIL ACCOUNT, the TARGET FACEBOOK ACCOUNT, and the TARGET INSTAGRAM ACCOUNT were used to communicate with customers and/or potential customers about the sale of unapproved and prescriptions drugs on the TARGET WEBSITE from September 2021 to the present.

## CONCLUSION

91.     Based on the aforementioned factual information, I believe there is probable cause to believe, and I do believe, that evidence of the TARGET OFFENSES is located within the TARGET EMAIL ACCOUNT, the TARGET FACEBOOK ACCOUNT, and the TARGET INSTAGRAM ACCOUNT, which constitute and contain items that constitute contraband, fruits, instrumentalities and evidence of crime, or material otherwise criminally possessed, or property that is or has been used as the means of committing the TARGET OFFENSES from September 2021 to the present.

92.     In consideration of the foregoing, I respectfully request that this Court issue warrants authorizing the search of information associated with the TARGET EMAIL ACCOUNT, the TARGET FACEBOOK ACCOUNT, and the TARGET INSTAGRAM ACCOUNT, as described in Attachments A-1 and A-2, for the information more specifically identified in Attachments B-1 and B-2. Because the warrant will be served on Google and Meta, who will then compile the requested records at a time

convenient to it, good cause exists to permit the execution of the requested warrants at

any time in the day or night.

James Formica -S    Digitally signed by James Formica -S
                    Date: 2023.02.16 13:10:55 -05'00'

_____
Special Agent James Formica
United States Food and Drug Administration
Office of Criminal Investigation


The truth of the foregoing affidavit has been attested to me by James Formica over the
telephone on this 16th day of February, 2023, at New Haven, Connecticut.

Maria E. Garcia    Digitally signed by Maria E. Garcia
                   Date: 2023.02.16 14:35:44 -05'00'

_____
HON. MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### Property to Be Searched

This warrant applies to information associated with the following email address:

### pinnedaminos@gmail.com

(referred to herein and in Attachment B-1 as the "Subject Account") that are stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), an e-mail provider located at 1600 Amphitheatre Parkway in Mountain View, California 94043 (referred to herein and in Attachment B-1 as "Google" or the "Provider").

## ATTACHMENT A-2

**Property to Be Searched**

This warrant applies to information associated with Meta Platforms, Inc. accounts:

- **Facebook account Pinned Aminos (account # 195500841961751)**

- **Instagram account pinned_aminos**

(referred to herein and in Attachment B-2 as the "Subject Accounts") that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California (referred to herein and in Attachment B-2 as "Meta" or the "Provider").

**ATTACHMENT B-1**

**Particular Things to be Seized**

**I.      Information to be disclosed by the Provider**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A-1, for the period from September, 2021 to the present:

a.      The contents of all emails associated with the Subject Account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses (including but not limited to email and IP addresses) associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All subscriber records or other information regarding the identification of the Subject Account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      All records or other information regarding the identification of the devices used to access the Subject Account;

d.      The types of service utilized; and

e.      All records pertaining to communications between the Provider and any person regarding the Subject Account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

The Provider is also requested to complete a certificate of authenticity for domestic business records that will satisfy Rule 902(11) and Rule 902(13) of the Federal Rules of Evidence.  A form of certificate of authenticity is attached.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, or instrumentalities of violations of the following offenses related to the sale, distribution, and dispensing of prescription drugs over the Internet:

a.  introduction of misbranded and unapproved new drugs into interstate commerce, in violation of 21 U.S.C. §§ 331(a), 331(d), and 333(a),

b.  smuggling of goods into the United States, in violation of 18 U.S.C. § 545,

c.  money laundering, in violation of 18 U.S.C. § 1956, and

d.  conspiracy to commit and aiding and abetting any of the forgoing crimes, in violation of 18 U.S.C. §§ 2 and 371.

(collectively, the "Target Offenses"), from the period September 1, 2021 to the present, including, but not limited to, the following:

1.    All records and information related to the sale, purchase, advertisement, distribution, dispensing, shipping, and/or transportation of misbranded and unapproved prescription drugs;

2.    All records and information related to financial accounts or any other accounts that hold money;

3.    All records and information related to payment of money, wire transfers, money transfers, deposits, withdrawals, checks, electronic funds and ACH transfers, credit/debit card processing, merchant accounts, and any instructions or directions related to such activity;

4.    All records and information related to the creation and hosting of websites used to commit and facilitate the Target Offenses;

5.      Evidence indicating how and when the Subject Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the Target Offenses and to the account owner.

6.      Evidence indicating the identity of the person(s) who used, accessed, owned, controlled, or created the Subject Account, including records that help reveal the whereabouts of such person(s);

7.      Evidence indicating the account user's state of mind as it relates to the Target Offenses for any user of the Subject Account; and

8.      Evidence indicating the identity of the person(s) who communicated with the Subject Account about matters relating to the Target Offenses.

## ATTACHMENT B-2

### Particular Things to be Seized

**I.   Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A-2 is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Meta, Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A-2 for the period from September, 2021 to the present:

A.    All subscriber information, in any form kept, pertaining to the Subject Accounts, including:

    1.    Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

    2.    Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

    3.    Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

    4.    Internet Protocol ("IP") addresses used to create, login, and use the

account, including associated dates, times, and port numbers;

5.      Privacy and account settings, including change history; and

6.      Communications between Meta and any person regarding the Subject Accounts, including contacts with support services and records of actions taken;

B.      All content (whether created, uploaded, or shared by or with the Subject Accounts), records, and other information relating to videos, images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata;

C.      All content, records, and other information relating to communications sent from or received by the Subject Accounts, including but not limited to:

1.      The content of all communications sent from or received by the Subject Accounts, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.      All records and other information about direct, group, and disappearing messages sent from or received by the Subject Accounts, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.      All records and other information about group conversations and

video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and all associated logs and metadata;

D.      All content, records, and other information relating to all other interactions between the Subject Accounts and other Facebook / Instagram users including but not limited to:

     1.      Interactions by other Facebook / Instagram users with the Subject Accounts or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

     2.      All associated logs and metadata;

E.      All photos and videos uploaded by the Subject Accounts and all photos and videos uploaded by any user that have the Subject Accounts tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

F.      All other records and contents of communications and messages made or received by the Subject Accounts, including all Messenger activity, private messages, chat history, video and voice calling history.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

The Provider is also requested to complete a certificate of authenticity for domestic business records that will satisfy Rule 902(11) and Rule 902(13) of the Federal Rules of Evidence.  A form of certificate of authenticity is attached.

II.  **Information to be seized by the government**

All information described above in Section 1 that constitutes fruits, contraband, evidence, or instrumentalities of violations of the following offenses related to the sale, distribution, and dispensing of prescription drugs over the Internet:

      a.  introduction of misbranded and unapproved new drugs into interstate commerce, in violation of 21 U.S.C. §§ 331(a), 331(d), and 333(a),

      b.  smuggling of goods into the United States, in violation of 18 U.S.C. § 545,

      c.  money laundering, in violation of 18 U.S.C. § 1956, and

      d.  conspiracy to commit and aiding and abetting any of the forgoing crimes, in violation of 18 U.S.C. §§ 2 and 371.

(collectively, the "Target Offenses"), from the period September 1, 2021 to the present, including, but not limited to, the following:

1.  All records and information related to the sale, purchase, advertisement, distribution, dispensing, shipping, and/or transportation of misbranded and unapproved prescription drugs;

2.  All records and information related to financial accounts or any other accounts that hold money;

3.  All records and information related to payment of money, wire transfers, money transfers, deposits, withdrawals, checks, electronic funds and ACH transfers, credit/debit card processing, merchant accounts, and any instructions or directions related to such activity;

4.  All records and information related to the creation and hosting of websites used to commit and facilitate the Target Offenses;

5.      Evidence indicating how and when the Subject Accounts were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the Target Offenses and to the account owner.

6.      Evidence indicating the identity of the person(s) who used, accessed, owned, controlled, or created the Subject Accounts, including records that help reveal the whereabouts of such person(s);

7.      Evidence indicating the account user's state of mind as it relates to the Target Offenses for any user of the Subject Accounts; and

8.      Evidence indicating the identity of the person(s) who communicated with the Subject Accounts about matters relating to the Target Offenses.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS</u>
## <u>PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ (the "Provider"), and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of the Provider.  The attached records consist of _____(pages/CDs/megabytes)].  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of the Provider, and they were made by the Provider as a regular practice; and

b.      such records were generated by the Provider's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of the Provider in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by the Provider, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                            Signature